THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.* CHRISTIAN M. KEEDY, and JAMES SNYDER, trading as KEEDY & SNYDER.

*Legal sufficiency of Evidence—Ordinary Care.*

If there be any evidence from which the jury may honestly find negligence on the part of the defendant, there is no error in allowing them to consider it, although it may not be of such character as to convince all minds that such negligence was committed.

What will amount to ordinary care, or the want of it, in any given case, must be determined by the standard of common prudence and experience in view of the special circumstances of any particular case.

APPEAL from the Circuit Court for Washington County.

The case is stated in the opinion of the Court.

*Exception.*—At the trial the plaintiffs offered three prayers, the second of which was as follows:

2. If the jury find from the evidence before them, that the defendant, its agents or employés, received the car load of wheat testified to in this case at Shenandoah Junction on Wednesday, May 29th, to be transported by the defendant over its road from said Shenandoah Junction to Washington, in the District of Columbia, and at said Washington to be delivered by the defendant for the plaintiffs, to J. G. and J. M. Waters, subject to the terms and conditions of the printed contract offered in evidence, and further find that said defendant, its agents or employés, transported said car load of wheat from said Shenandoah Junction, to Washington Junction, and at said Washington Junction side-tracked said car

load of wheat, and further find that while said car load of wheat was standing upon said side-track, said defendant, its agents or employés, had warning of the approaching flood, whereby the wheat was damaged, and further find that said defendant, its agents or employés, notwithstanding such warning of danger, did not exercise ordinary skill, prudence, diligence and foresight to save said car load of wheat from being injured and damaged by flood, and further find that by reason of said failure upon the part of said defendant, its agents or employés, to exercise said ordinary skill, prudence, diligence and foresight, said car load of wheat was caught and submerged by the flood, and injured and damaged on June 1st, then the plaintiffs are entitled to recover to the extent of the injury sustained.

And the defendant asked the two following instructions:

1. That if the jury find that the wheat mentioned in the plaintiffs' declaration was injured and destroyed by a sudden and extraordinary flood, then the plaintiffs are not entitled to recover in this action, unless the jury should find that the defendant was guilty of negligence in not taking the said wheat to a safe place after it or its agents knew, or had reasonable cause to believe, that it was in danger of being injured or destroyed by said flood, and that there is no evidence in this cause of such negligence.

2. That there is no legally sufficient evidence in this case to entitle the plaintiffs to recover, and the verdict of the jury must be for the defendant.

The Court (ALVEY, C. J.,) rejected the prayers of the defendant, and the first and third prayers of the plaintiffs, and granted the plaintiffs' second prayer in connection with the following instruction by the Court:

The jury are instructed, that if they find from the evidence before them that the damage to the wheat, for

which this action is brought, was occasioned by a sudden high and extraordinary freshet in the Potomac river, which occurred the last of May or the first of June, 1889, overflowing and submerging the railroad track of the defendant at the Washington Junction of the Metropolitan Branch road, where the wheat was then in a car on the tracks of said road, and that such freshet was the immediate and direct cause of the damage to the wheat, as testified to by the witnesses, then the plaintiffs are not entitled to recover for such damage to the wheat, although there may have been undue and unnecessary delay by the defendant in the transportation of said wheat to its place of destination previous to the occurrence of such damage thereto by the freshet, unless the jury believe from the evidence before them that the defendant could, by reasonable exertion and diligence in the use of the means at its command after discovering the impending danger to the wheat from the rising flood, have saved the wheat from injury by the water by moving the car to a place of safety, or by the reasonable use of any other means in its power, have prevented such damage, but that the burden of proof of the want of diligence and care in this respect on the part of the defendant rests with the plaintiffs. And if, by the use of reasonable care and dilligence, after the freshet had subsided, the wheat, or any portion thereof, could have been saved from ruin, it was the duty of the defendant so to save the same, and if any portion of the wheat was lost or ruined that could have been so saved the defendant is liable therefor.

The defendant excepted, and the verdict and judgment being against it appealed.

The cause was argued before MILLER, ROBINSON, IRVING, BRYAN, FOWLER, MCSHERRY, and BRISCOE, J.

*J. Clarence Lane,* (with whom was *Henry H. Keedy,* on the brief,) for the appellant.

Baltimore and Ohio R. R. Co. *vs.* Keedy and Snyder.

*M. L. Keedy,* for the appellees.

IRVING, J., delivered the opinion of the Court.

The appellees shipped five hundred bushels of wheat by the appellant's railroad, to Georgetown. At Antietam Station, on the Shenandoah Valley Railroad, a Shenandoah Valley car, No. 118, was loaded and was taken to Shenandoah Junction, where it was delivered to the appellant's agents on the 29th of May, 1889, and was taken by them to Washington Junction, and placed on a sidetrack. Washington Junction being a distributing point for Washington City, cars consigned to Washington remained there until ordered to be brought in. Appellees were notified of the wheat being at Washington Junction, and they were aware of the custom of the railroad to keep Washington freight at Washington Junction till orders were given to bring it in. Whilst this wheat remained at Washington Junction a flood came which submerged the appellant's tracks at that point, and the wheat was substantially destroyed, for it did not bring enough when sold by the road to pay the freight on it. The appellees had refused to receive it and the appellant had to sell it. This suit was instituted to recover damages for the loss of the wheat occasioned, as the plaintiffs claimed, by the negligence of the appellant's agents.

No question is raised, on the ground of delay in transportation, in this Court; that was settled by a ruling of the Circuit Court to which there was no exception, and is conseqently not involved in this appeal. The sole question in the case is whether there was any evidence in the case legally sufficient to go to the jury to charge the appellant's agents with negligence respecting the wheat whilst it was in their care and custody at Washington Junction, through which it was ruined by the flood.

The appellant offered two prayers which raise this question; and having been rejected by the Court the complaint here is that there was error in that ruling, and in granting the instruction which was given on the behalf of the appellees. If the case ought to have been withdrawn from the jury on appellant's prayers, it would follow, of course, that the instruction which was granted the plaintiffs was also in error. After careful examination of the proof offered on the side of the appellees we cannot say there was error. The evidence may not have been of such character as to convince all minds that there was culpable negligence on the part of the appellant's agents; but if there was any evidence from which a jury might honestly reach a conclusion, such as was reached by the jury in the case, then there was no error in allowing the jury to consider it. William F. Harrison testified, on the call of the plaintiffs, (appellees) that he was, on the first of June, 1889, telegraph operator and agent of the appellant at Washington Junction; and that Shenandoah Valley car No. 118, loaded with wheat, was brought to Washington Junction on Wednesday, May 29th, 1889, and was placed on the side-track at Washington Junction. He also testified that another freight train besides that which brought this car ran daily, except Sunday, from Washington Junction to Washington City, D. C., starting from Washington Junction; that the side-track on which this car was placed was on the far side of the Metropolitan Branch, from the river, and extended a long distance along the Metropolitan Branch, crossing a culvert and running up to the station platform, being connected with the main track by a switch only, at the end towards Washington City; that it is about five hundred and twenty-five feet from the end of the side-track at platform to the culvert; that there were seventeen cars on the side-track including this car in question, and it was the fifth from the end of the side-track where it

connects with the Metropolitan Branch, and this car was about four hundred feet from the platform, at the end of the switch; the fall or decline in the side track, from the end of the platform to where the car was standing, was about three feet; and that the water rose at its highest point, to a depth of three feet three inches over the side-track at its end at the platform, and to the same depth over the Metropolitan Branch in front of the station; and that the water rose to a height of six, seven or eight feet over the tracks below the culvert at the switch; and did not, at any time, cover the main line at the station building and back of it; that from the railroad at Washington Junction to the river is about one thousand feet, a flat lying between, and that the water backs up from the river under the culvert, which is an arched culvert made of cut masonry *at the end;* and he did not know what was back of it, and ten or twelve feet of fill over it.  By another witness appellees proved that the culvert is made entirely of cut masonry, and from twelve to eighteen feet of fill over it, and witness said, "it looks like it would hold a mountain." Harrison, the agent, testified that on Saturday morning, June 1st, he saw "the river was rising; that it rose gradually until about midnight, Saturday night, when it reached its highest point; that the engine of the Frederick train was there after it returned from down the track; it left Washington Junction at 6.45 and returned in a half or three-quarters of an hour; did not try to get Shenandoah Valley car, No. 118, or any other out; asked Virtue, the engineer, to take them out and he said it was too dangerous to cross the culvert; that it was shortly after the train returned he asked Virtue to get cars out, but don't know how long; that on June 5th a freight train left Washington Junction, the freight train that starts at that point for Washington; that Shenandoah Valley car, No. 118, was taken from

Washington Junction on June 8th or 9th; that the water when at its highest point, rose about two feet up the side of the car; that the sills are about four inches high; that the said Shenandoah Valley car, No. 118, was not opened when upon the side-track, and nothing was done to the wheat in said car; that there is another side-track between the Metropolitan Branch and the river, and a curved track connects the old line with the Metropolitan Branch; that the water covered about one-third the distance of the curved track."

On cross-examination this witness further stated, that to get the cars out it would have been necessary to cross the culvert five times; "that when the train returned about 7.30 he was in the office telegraphing; not telegraphing to any place in particular; that he noticed a short time after the train returned, that the river was rising rapidly; and then noticing that the cars on the siding might be in danger from the rising flood, he asked the conductor and the engineer of the Frederick train to go down and bring the cars up on high ground; but they declined to do so, alleging there was danger in crossing the culvert, which was then under water, and for fear the water would extinguish the fire in the engine."

On the cross-examination of the conductor, who was offered as a witness for appellant, and testified that when he was asked by the agent to get the cars out, he thought it too unsafe for the attempt to be made to cross the culvert, for it was then under water and would put out the fire in the engine; he testified that some time after the return of the train to Washington Junction he walked about halfway to the culvert, and noticed the side track next to the river undermined, and the water was striking against the bed of the railroad under the end of the ties, and was not up to rails at culvert; and Virtue, the engineer, on cross-

·examination by the plaintiffs, testified that when he was asked to get the cars out everything was submerged, and there was then three feet of water at culvert.

How long after the Frederick train had come back it was that the station agent asked the conductor and engineer to get the cars out does not appear. The agent says "shortly after," and the conductor says "a short time." These are indefinite expressions, and may mean a longer or a shorter time according to the subject-matter with reference to which they are used, or according to the particular ideas, of the person using them. As to what the conductor meant we have some means of deciding. He says in another part of his testimony, it was "between eight and nine o'clock in the morning, and not long after the train had come back." This witness had stated· that at 6.45 he had started with his train for Washington, and having gone two or three miles on his way, finding the water on the track too deep to be safe to proceed had backed train to the Junction across the culvert, but did not notice the condition of things at the culvert at that time. When the train got back to the Junction the agent testifies that it was about half-past seven o'clock. The conductor says that it was between 8 and 9 o'clock when he was asked to take cars out. Putting it midway between these hours, there was a space of two hours between the return of the train to the Junction and the request to get the cars out. Now the agent knew the water was rising. He knew it was doing so alarmingly, and that this train had been compelled to come back because the tracks beyond the culvert were dangerously submerged. The culvert was not yet submerged, however, for the conductor looked "some time after,"—another indefinite expression—and saw that at the culvert it was not up to the track, but was at the bottom of the ties. A jury might with such evidence before them think that

the agent was derelict, and not prompt enough in looking
after the safety of the cars; and they might have reason-
ably found that had he been more vigilant this car
might have been removed to a place beyond the reach of
the water; for the testimony showed there were points
of safety. Exactly how soon the agent knew of the
approaching flood does not appear. He says he noticed
in the morning the river was "rising gradually." The
jury might reasonably find that it was as early as seven
o'clock, for the train left at 6.45, and he knew was driven
back by the water covering the tracks beyond the
culvert. It, with its passenger cars and passengers,
reached the station again as early as half-past seven.
The culvert was passed in safety with these passengers
in the cars. It was some time after this, the conductor
said, when he looked and saw the water was striking
under the ties on which the rails were laid, and was not
over the road and rails at the culvert. The agent knew
according to his testimony it was rising gradually, and
it was rapidly doing so. Though it did not come with
a rush, he knew the rising was continuous, and that
though the rise was "gradual" it was fast. It was also
in evidence before the jury, that the rise continued
till midnight, when the highest point was reached.
Taking the height attained, and the hours occupied in
doing so, the rise was an average of six inches per hour.
With such evidence might not the jury, exercising their
judgment honestly, have reached a conclusion that if the
agent had acted promptly on the alarming warning
which he had of impending danger, and called on the
conductor and engineer sooner than he did, to remove
the cars to a place of safety, that it might have been
done before the condition of things was such, that when
it was made those officers thought it impracticable to ven-
ture, if not impossible to accomplish ? We can not say
a fair minded and honest jury might not so believe and

find. If such jury should think that under such cir-
cumstances, an ordinarily prudent man would, on the
same evidence of danger before him which this agent
had, have acted more promptly, and with more discretion
and judgment than was exercised by this agent, and
that by such action could have avoided the damage to
the wheat, then certainly we think they would be justi-
fied in finding as they did. All that the Court was
called upon to say was, whether the evidence was legally
sufficient to justify a finding for the plaintiffs. It was
for the jury to find by the verdict whether the evidence
was sufficient in fact to establish negligence on the part of
the appellant's agents. What will amount to ordinary
care or the want of it in any given case "must be deter-
mined by the standard of common prudence and experi-
ence in view of the special circumstances" of any par-
ticular case. What may be ordinary care in view of one
state of facts may fall short of it under another state of
facts. Hence, as was said by this Court in *Balto. & Ohio
Railroad Co. vs. Fitzpatrick*, 35 *Md.*, 32, "a jury of intel-
ligence and experience, from their knowledge of the
usual and ordinary conduct of their fellow-men, are the
best judges of such a question." *Jones, et al. vs. Jones*,
45 *Md.*, 154; *Kagel vs. Totten*, 59 *Md.*, 454; *Clarke vs.
Dederick*, 31 *Md.*, 148; *Northern Central Railway Co. vs.
State, use of Price, et al.*, 29 *Md.*, 420; *Balto. & Ohio
Railroad Co. vs. State, use of Miller*, 29 *Md.*, 252, may be
cited in further support of this ruling.

What we have said disposes of the question whether
the appellant's prayers, based on the contention that
there was no legally sufficient evidence, to take the case
to the jury, were correct. The Court rejected those
propositions, and in doing so, we think it was right.
It only remains to consider if there was any infirmity in
the instructions actually granted at the instance of the
appellees and of the Court's own motion. Counsel

directed their arguments altogether to the question of legal sufficiency of evidence before the jury to justify a finding of negligence on the part of the appellant's agents and employés; and no special objection to these instructions given to the jury has been noted; so we suppose none was intended to be made to the form or substance of the instruction, if there was evidence enough to take the case to the jury. On the question whether there was evidence legally sufficient to go to the jury to show negligence in not removing the car to a safer place, we said there was; and on that evidence we think the case was properly committed to the jury on the instructions given. After reciting the evidence respecting the shipping of the wheat by appellant's road and its being brought to Washington Junction, the instruction proceeds to state that, if "while the wheat was standing upon said-side track, if said defendant, agents or employés had warning of the approaching flood, whereby the wheat was damaged, and further find that said defendant, its agents or employés did not exercise ordinary skill, prudence, diligence and foresight to save said car load of wheat from being injured and damaged by the flood, and further find that by reason of said failure upon the part of said defendant, its agents or employés to exercise said ordinary care, prudence, diligence and foresight, said car load of wheat was caught and submerged by the flood, and injured and damaged on June 1st, then the plaintiffs are entitled to recover to the extent of the injury sustained." To this language of the plaintiffs' prayer the Court added that if they find "that such freshet was the immediate and direct cause of the damage to the wheat, although there may have been undue and unnecessary delay by the defendant in the transportation of said wheat to its place of destination previous to the occurrence of such damage thereto by the freshet, the plaintiffs are not

entitled to recover unless the jury believe from the evidence before them that the defendant could by reasonable exertion and diligence in the use of the means at its command, after discovering the impending danger to the wheat from the rising flood, have saved the wheat from injury by the water by moving the car to a place of safety, or by the reasonable use of any other means in its power have prevented such damage, but that the burden of proof of the want of diligence and care in, this respect on the part of the defendant rests with the plaintiffs.'' This addition to the plaintiffs' prayer ·by the Court *mero motu*, was certainly in the interest of the defendant, being designed to prevent any possible mistake on the part of the jury as to the effect of the evidence. The latter part or clause of the Court's superadded instruction was evidently supposed by counsel to refer to the possibility of saving the wheat, or a part of it after the flood had come and wet the wheat in part; and the counsel for the appellant, as to that, has said it was not necessary to discuss that, for ''there was no evidence to show that any part of the wheat could have been saved by anything the appellant could have done after the freshet.'' We see no error in allowing the jury to consider that aspect of the case also. The wheat was only partially wet in the beginning. The evidence established it to be five feet deep in the ends of the car and sloping somewhat towards the center. The sills were proven to be four inches thick and the flooring one inch, which would make five inches to come from the two feet which was the distance witness said the water came up the side of the car. Making this deduction the jury would find only nineteen inches of water in the wheat, leaving thirty-one inches of wheat above the reach of the water. The evidence showed that the door of the car was never opened while the car remained at the Junction. There

certainly was no error in allowing the jury, on that state of facts, to determine from their practical knowledge, whether, by the exercise of ordinary diligence and care, some of that wheat might not have been removed and saved from total destruction, and whether an ordinarily prudent man would not, and could not, with reasonable effort, under like circumstances, have saved a large part of that wheat, even after the partial submerging.

Finding no error, the judgment will be affirmed. .

*Judgment affirmed.*