# CASES ARGUED AND DETERMINED

## IN THE

# SUPREME COURT OF VERMONT

PORTER SCREEN MANUFACTURING COMPANY *v.* CENTRAL VERMONT
RAILWAY COMPANY.

May Term, 1917.

Present: WATSON, C. J., HASELTON, POWERS, TAYLOR, and MILES, JJ.

Opinion filed October 2, 1917.

*Motion for Directed Verdict—When too General—Rules and
Regulations—Common Knowledge—Evidence—Materiality
—Railroad Freight Agent—Notice of Contents of Freight
Car—Presumption—Jury Question—Act of God—Floods—
Weather Predictions—Reliance Thereon—Negligence—
Newspaper Publications — Notice — Prejudicial Error —
Charge—When Without Error.*

A motion for a directed verdict which fails to point out any precise
basis upon which it is predicated is too general for consideration.

Rules of the American Railway Association and Regulations of the In-
terstate Commerce Commission, providing that inflammable sub-
stances, including unslaked lime, shall be loaded on freight cars in
a certain manner, are to be understood in the light of common
knowledge of the effect of water upon unslaked lime and therefore
testimony of a railroad freight agent as to his knowledge of this
fact cannot be said to be immaterial.

Where the freight agent of a railroad knew that a car, stated to be
loaded with lime, might contain either slaked or unslaked lime,
he was put upon inquiry regarding it, and was taken to have had
full knowledge in this respect.

It will not be presumed that a freight car was defective, and in need of repairs because it had been placed upon a track used as a repair track, where the question whether the track was exclusively used for such purpose was, on the evidence, for the jury.

Damages caused by an act of God are those proximately due, directly and exclusively, to natural causes without human intervention, which could not have been prevented by any amount of foresight reasonably to be expected.

A railroad company is responsible for damage to a shipment of merchandise on a car in its freight yard, caused by a flood of such an unprecedented character as to be an act of God, which damage might have been avoided or prevented by human prudence, foresight, pains and care reasonably to be expected from the carrier, but not exercised by it.

On the evidence *held*, defendant's freight agent was not, as matter of law, justified in relying upon a prediction by a weather forecaster, published in a newspaper, as to the probable danger to be expected from a flood.

In an action against a railroad company to recover damages for the failure to deliver merchandise which it had undertaken to transport, while in transit, *held*, the negligence of a connecting carrier in failing to take measures for the protection of the goods against high water was a jury question.

Printed articles in a public newspaper do not have the effect of constructive notice of the facts stated therein; at most they are only actual notice, and not that unless they are read.

In an action against a railroad company to recover damages for the failure to deliver property which it had undertaken to transport, and which was destroyed, while in the freight yard of a connecting carrier, by fire caused by high water from a river coming in contact with a nearby car of unslaked lime, the admission of evidence that a local weather forecaster sent out notices of approaching high water to third persons in the vicinity was prejudicial error, it having appeared that the connecting carrier, during periods of high water, usually telephoned or sent to the forecaster for information.

An exception to an instruction given as requested by the exceptor is without force.

There can be no error in failing to charge in a manner not applicable to the evidence.

CASE for negligence in failing to deliver a carload of screens that defendant had undertaken to transport as a common car-

rier.  Plea, the general issue with notice.  Trial by jury at the September Term, 1915, Chittenden County Court, *Miles, J.*, presiding.  Verdict and judgment for plaintiff.  Defendant excepted.

At the close of all the evidence, defendant moved for a directed verdict.  Motion overruled to which defendant excepted. The opinion states the case.

*John W. Redmond* for defendant.

The flood was an act of God.  *Eagan* v. *Central Vermont Ry. Co.*, 81 Vt. 141.

The burden is on plaintiff to show that the negligence of the connecting carrier mingled with the act of God as an active, co-operative and proximate cause of the damage.  It is not sufficient merely to show the non-delivery of the shipment.  The doctrine that the carrier is an insurer does not apply.

*Memphis R. R. Co.* v. *Reeves*, 77 U. S. 176; *Ryan* v. *Missouri, etc., R. R. Co.*, 65 Tex. 13; *Terre Haute, etc., R. R. Co.* v. *Sherwood*, 132 Ind. 129, 31 N. E. 781; *Hull* v. *Chicago, etc., R. R. Co.*, 41 Minn. 510, 43 N. W. 391; *Jones* v. *Minneapolis, etc., R. R. Co.*, 91 Minn. 229, 97 N. W. 893; *Armstrong, Byrd & Co.* v. *Ill. Cent. R. R. Co.*, 29 Oka. 352, 109 Pac. 216; *Long* v. *Penn. R. R.*, 147 Penn. St., 343, 23 Atl. 459; *Little Rock, etc., R. R.* v. *Talbot*, 39 Ark. 523; *Mitchell* v. *U. S. Express Co.*, 46 Iowa 214; *New Orleans* v. *New Orleans, etc., R. R. Co.*, 20 La. Ann. 302; *Kansas Pac. R. Co.* v. *Reynolds*, 8 Kans. 623; *Sager* v. *Portsmouth, etc., Co.*, 31 Me. 628; *Jordan* v. *Am. Ex. Co.*, 86 Me. 225, 29 Atl. 980; *Read* v. *St. Louis, etc., R. R. Co.*, 60 Mo. 199; *Davis* v. *Wabash, etc., R. R.*, 89 Mo. 340, 1 S. W. 327; *Witting* v. *St. Louis, etc., R. R. Co.*, 101 Mo. 631, 14 S. W. 734, 10 L. R. A. 602; *Smith* v. *Am. Ex. Co.*, 108 Mich. 572, 66 N. W. 479; *Whitworth* v. *Erie, etc., R. R.*, 87 N. Y. 413; *Smith* v. *North Car. R. R. Co.*, 64 N. Car. 235; *Farnham* v. *Camden, etc., R. Co.*, 55 Pa. St. 53; *Hubbard* v. *Harnden Ex. Co.*, 10 R. I. 244; *Railway Co.* v. *Manchester Mills*, 88 Tenn. 653; *Washburn-Crosby Co.* v. *William Johnson Co.*, 125 Feb. 273; *Clark* v. *Barnwell*, 12 How. 272; *Transportation Co.* v. *Downer*, 11 Wall. 129.

The fact of publication of articles in newspapers in no way tends to show knowledge of what is contained therein by one shown merely to have had the opportunity to read them.  *State* v. *Alpert*, 88 Vt. at p. 202; *American Ice Co.* v. *Narvey*, 56 Neb. 482; *King* v. *County*, 29 N. J. Law 94; *Belyhoover* v. *Blackstock*,

3 Watts. 20, 27 Am. Dec. 156; *Watkins* v. *Peck,* 13 N. H. 360, 40 Am. Dec. 156.

The testimony of Todd as to his custom in giving publicity to his forecasts was not admissible. *Philip* v. *Conant,* 30 Vt. 277; *Walsworth* v. *Barren,* 54 Vt. 677; *Harris* v. *Howard,* 56 Vt. 695; *Aiken* v. *Kennison,* 58 Vt. 665; *Bishop* v. *Wheeler,* 46 Vt. 409; *Jones* v. *Ellis,* 68 Vt. 544; *Pictorial League* v. *Nelson,* 69 Vt. 162.

*Ezra M. Horton* and *Warren R. Austin* for plaintiff.

The failure of the connecting carrier to take any precaution whatever, in view of the situation, was negligence, and was concurrent with the act of God in causing the damage. *Dunson* v. *N. Y. C. R. R. Co.,* 3 Lansing 265-269; *Graham & Co.* v. *Davis & Co.,* 4 Ohio St. 362, 380; *Fentiman* v. *A. T. & S. F. R. Co.,* 44 Tex. Civ. App. 457, 461, 462; *Reed* v. *Spaulding,* 30 N. Y. 630, 64 *et seq.; Hayes* v. *Kennedy,* 41 Penn. St. 378-381, 384; *National Rice Milling Co.* v. *New Orleans N. E. R. Co.,* 61 So. 708, 718-722.

The newspaper articles were admissible. 4 Chamberlayne, Mod. Law of Ev., Secs. 2581, 2668.

WATSON, C. J.    Although the trial of this case was by jury, the material facts were largely established by agreement of parties. As will be seen, there was really but one disputed primary question of fact submitted to the jury.

It appeared from the agreed facts that on March 24, 1913, the plaintiff, at Winooski, this State, loaded Grand Trunk car No. 9447 (hereinafter designated as ''car 9447'') with screen doors and window screens, valued at $824.13, and the car so loaded was then received by the Central Vermont Railway Company for transportation by it and connecting carriers to the Eastern District Terminal in Brooklyn in the State of New York, in accordance with the bill of lading delivered by the defendant to the plaintiff; that in the course of such transportation the car left Winooski on March 25, 1913, was hauled over the lines of the successive carriers to Troy, N. Y., where it arrived on March 27, and by the Delaware and Hudson Railroad was there delivered to its connecting carrier, the New York Central and Hudson River Railroad Company (called in this case the ''N. Y. C.'')

at 12.15 p. m. of that day, by which it was then and there accepted for transportation over its line to the place of destination; that after thus receiving the car, the latter carrier placed it in its freight yard at Adams Street station in Troy, on the track designated as track "No. 2," on the blue print marked "plaintiff's Exhibit D," at a point about two hundred feet south of Adams Street. The exact time in the afternoon when this car was thus placed on track No. 2, is a little in doubt: some of the evidence tending to show it to have been between 12.30 and 1.00, and some, that it was between 1.30 and 2.00. It further appeared from the agreed facts that L. & N. car No. 94242, (hereinafter designated as "car 94242",) loaded at Chazy, N. Y., with unslaked lime, and destined for Worcester, Mass., was delivered by the Delaware and Hudson Railroad to the N. Y. C. at Troy, at 1.10 p. m., on March 26, 1913, and later in the same day it was placed by the latter company in its said yard on the track designated as "No. 3," on the blue print, Exhibit D, this track being the next parallel track west of No. 2, mentioned above. When car 9447 was placed on the latter track, it stood opposite the car of lime, and, taking into account the overhang, the two cars were about three feet apart, thus remaining until they were destroyed by fire as stated below. The elevation of top of rail of track No. 3, where the car of lime stood, is 21.62 feet above sea level, and top of rail of track No. 2, where the other car stood, is 21.73 feet above sea level. The rails are five inches high, and the floor of a freight car is substantially four feet above top of rails. The yard is somewhat descending from the place of these cars west toward the river. East and south from the same place, it is more or less ascending.

It appeared from the evidence that the waters of the Hudson River above Troy rose to a great height, creating an unprecedented flood at the latter place, and overflowing Adams Street yard to such a depth that they entered the said carload of lime, slaked the lime, thereby causing heat which set fire to the car. This fire was communicated to car 9447, destroying it and all its contents. The evidence showed that the flood there (being one free from ice) was unparallel in history, and beyond question of such magnitude as to be an act of God, within the meaning of that term; yet the plaintiff contended that the defendant was not entitled to the benefit of immunity from responsibility as is usual in cases coming under the term "act of God," for the reason that

the evidence showed negligence on the part of the N. Y. C., in not exercising the requisite degree of care and diligence to protect the plaintiff's property from such destruction, after the railroad company foresaw or, in the exercise of due care, should have foreseen, with reasonable probability, the happening of such high water as was likely to subject it to extraordinary dangers, as the car was located with reference to the car loaded with unslaked lime. On the other hand, the defendant claimed that, by the tendency of the evidence, the proximate cause of the destruction of the property was the unprecedented flood, without any contributing negligence on the part of the carrier. It was agreed by the parties that in all respects the relationship between defendant and the N. Y. C. was such that under the federal statute known as the "Act to Regulate Commerce" (Act Cong. Feb. 4, 1887, C. 104, 24 Stat. 379), and the amendments thereto, the former, as the initial carrier is liable to the plaintiff for any damage to the shipment mentioned, proximately caused by the negligence of latter, as connecting carrier. The bill of lading, section 1, states that the carrier or party in possession of the property therein described shall be liable for any loss thereof or damage thereto, except that no carrier or party in possession "shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy," etc.

At the close of the evidence, the defendant moved for a directed verdict, assigning as grounds therefor (stated in condensed and comprehensive form) that on all the evidence (1) the plaintiff is not entitled to recover; (2) the sole proximate cause of the destruction of the property in question was an act of God; (3) no negligence on the part of either the defendant or the N. Y. C., concurred with the act of God as a proximate cause of the destruction of such property. The motion was overruled, and exception saved.

The first ground of the motion fails to point out any precise basis upon which it is predicated, and is therefore too general for consideration. *Castonguay* v. *Grand Trunk Ry.*, 91 Vt. 371, 100 Atl. 908. The other two grounds are considered together.

At the time in question, Leland Wadsworth was freight agent for the N. Y. C. at Troy, having general supervision of the freight traffic, including the freight yard of the company at that place, and including also the movement of trains in the yard. He resided at Troy. At that time, Charles A. Lloyd was day

yard-master of the Adams Street yard, had charge of the yard, and direct charge and control of the movement of trains in and out and about the yard, under the supervision of the freight agent. At the same time, Patrick J. McCormick was night yard-master, his duties at night and his authority being similar to those of Lloyd in the day time. The yard-master knows where every car is located in the yard. There was a "running slip" accompanying car 94242, showing the car number, initial, destination, contents, and consignee, which paper came into the freight agent's office in Troy, in the usual way, intended to convey to such agent the information specified on it, about noon of March 26th. Indeed, in connection with the plaintiff's introduction of evidence showing this, counsel for defendant conceded that there was no question about the facts of this matter; that the N. Y. C. knew it had a carload of lime on that day. Knowing this, and further knowing what car it was, and where it was located on track No. 3, the railroad company knew that this car was still at the same place the next day, when car 9447 was received and placed directly opposite on track No. 2, so that the two cars were within 3 feet of each other.

The American Railway Association Rules and the Interstate Commerce Commission Regulations for the Transportation of Dangerous Articles other than Explosives, before and at the time in question, state that: "Carload lots of crude camphor, cotton, * * * * or other articles liable to be ignited by sparks, as well as unslaked lime and calcium carbide, both of which must be protected from water, should, when practicable, be loaded in tight cars, with doors stripped, and, when practicable, these cars must not be placed next to cars placarded 'EXPLOSIVES.'"

The freight agent testified to receiving a copy of the rules and regulations mentioned, and to knowing about the foregoing rule; but that he did not know that if water entered the carload of lime and slaked the lime, it would set fire to the car; that a set of those regulations was also transmitted to the yard-masters, and that schools were held for the instruction of them and their crews in the prudent handling of explosives and other dangerous matters; that the rule did not convey to him the idea that the writer of it meant that lime, when slaking, was likely to burn a car; but conveyed to his mind only the idea that if the lime became wet it would be spoiled. This rule was received in evidence subject to defendant's exception on the ground of immateriality.

But we think it cannot be said to be immaterial. The rule is to be understood in the light of common knowledge that unslaked lime is slaked by the action of water upon it, and if the quantity be large, much heat is produced and perhaps fire. Considering the classification made (in the rule) for transportation purposes, the imperative direction to protect unslaked lime from water, and the provision, applicable alike to cars loaded with such lime and to those loaded with articles liable to be ignited by sparks, as to not placing the cars next to cars loaded with explosives, it may well be said that, reasonably understood, the rule is notice to a common carrier, its agents and servants having freight traffic in charge, that if a car, loaded with unslaked lime, be entered by water, the slaking of the lime caused thereby is liable to result in firing the car. The freight agent testified, however, that the "running slip" accompanying car 94242 stated its contents to be "lime," without specifying whether it was slaked or unslaked, and consequently he did not know the lime to be of the latter character; that there is a commodity known as "slaked lime," and also one known as "unslaked lime." But knowing that the lime might be of either character, one a dangerous commodity in transportation, and the other not, he was put upon inquiry regarding it, and will be taken to have had full knowledge in this respect.

The ice had gone out of the river. The flood was caused by rainfall which covered a period from March 21st to March 28th, inclusive. During that period the precipitation in the watershed of the Hudson River above Troy, was approximately 5½ inches. The evidence tended to show that at Troy, at 7.00 in the morning of the 26th, the height of the water in the river was 17.7 feet above sea level; that after the 26th the observer was not able to get near enough to the gage to read it, the water was so high; that on the 28th the water at Troy rose to the height of 29.4 feet; that the records of the Weather Bureau in Albany, seven miles from Troy, showed the height of the water above sea level on the 27th at 8.00 a. m., and at intervals of half an hour thereafter until 11.30 p. m.; that at Troy the average would be from 5 to 7 feet higher than at Albany. The evidence further tended to show that the water began to come into the Adams Street yard in the forenoon of the 27th, rising gradually and continually. Whether it came up to or over track No. 2, at the time when car 9447 was placed upon it, is not quite certain;

but the evidence tended to show that at about 2.30 p. m., it had so risen as to be five inches deep over the rails; that then it was impossible to get into that track, because of timbers floating about in the water. At 6.30 p. m., the water was fifteen inches over the rails, later increasing to about five feet. There was no evidence that the N. Y. C., or any of its agents or servants, did or attempted to do anything by way of moving car 9447 from where it stood on track No. 2, to a place of safety, after the water began to come into the yard. It appeared that freight agent Wadsworth and yard-master Lloyd were about their duties at that yard, as usual, throughout the day of the 27th, observed, and knew of the rise of water in the river, also in the freight yard after it began to come in there.

The evidence tended to show that track No. 3 was a repair track upon which cars in a badly broken condition were placed for repairs; that the car containing the lime was in such condition and consequently was placed upon that track; and that principally because of such broken condition, it could not be taken therefrom before the water had risen so high as in itself to prevent so doing. There was no evidence upon which it can be said that the putting of this car there was negligence on the part of anyone. Some of the evidence tended to show that track No. 2 was exclusively used as a repair track and upon it were placed cars slightly damaged; while other evidence tended to show that it was a sort of miscellaneous track, used to put any cars on, if need be. There was no direct evidence that car 9447 was defective when put upon that track; but the fact of its being placed there is urged as showing that it needed repairs, and this upon the principle that everything is presumed to be rightly and duly performed until the contrary is shown, citing *Bank of United States* v. *Dandridge,* 12 Wheat. 64, 6 L. ed. 552, and other cases. Yet this rule of presumption presupposes the two facts upon which it must here be based, namely, that track No. 2 was used exclusively as a repair track, and that car 9447 was placed thereon, to be permanently fixed. The second of these facts stands as conceded; but the existence of the first (the major premise) was of necessity a question to be determined by the jury upon evidence the tendency of which was not all one way. It follows that in disposing of the exception to the overruling of the motion for a directed verdict, the principle invoked does not apply. 3 Harv. L. Rev. 162.

The plaintiff used the deposition of George T. Todd who testified that he had been in charge of the United States Weather Bureau in Albany for over ten years, and was thus in charge at the time of this flood; that the object of the office there is to forecast the weather and flood conditions in that vicinity, and to give the forecasts to the public; that during the period of the flood in March, 1913, his forecasts were published through daily weather maps, also in daily newspapers published in Albany, every effort being made to reach business and manufacturing interests of all kinds in the vicinity; and the same were telephoned to the *Troy Times,* a daily newspaper published in Troy; that water freshets there can be forecasted 24 to 36 hours in advance; that such forecasts are formulated from information received from river-gaging stations in the upper tributaries of the Hudson and the Mohawk rivers, and are very correct; that on the morning of March 26, 1913, he sent out forecasts of the freshet, and at 10.00 in the forenoon of the 27th he sent out a forecast of a severe flood which would probably reach a height of 25 to 26 feet at Troy, and telephoned the same to the office of the *Troy Times;* that the height reached was even greater than forecasted, it being at Troy 29.4 feet; that deponent was at the telephone all day of the 27th, answering inquiries in regard to the flood; that the N. Y. C. usually called him by telephone during periods of high water, numerous times a day, but he could not swear that it called him on that day; nor could be remember whether he furnished the company a map prior to this flood, but thought he did to some man in the company, though did not know who he was; that at the time of this flood and before, the N. Y. C. generally called up by telephone or sent some man to the office. The evidence tended to show that freight agent Wadsworth and yard-master Lloyd knew that for a score of years or more the United States Government had maintained a Weather Bureau and forecaster at Albany, but that neither of them took any steps to ascertain from the forecaster at the time of this flood, the probabilities as to the height the waters of the Hudson might reach or when; that the superintendent of the N. Y. C. had his office in Albany, and from there directed operations in Troy, but gave no directions on March 27th, looking to the protection of freight or freight cars in the yard at that place, from the consequences of the pending flood.

The foregoing is a general statement of the condition of things at Troy on March 27th, and of the actions and doings of the carrier last named, its agents, and servants, material to this action.    Greater detail in stating some of the evidence, however, is necessary later, in passing upon questions presented concerning it.    In order to be a defence to the action, as an act of God, the damages suffered by the plaintiff must have been "proximately due, directly and exclusively, to natural causes without human intervention, which could not have been prevented by any amount of foresight, pains, and care, reasonably to be expected." *Eagan* v. *Central Vermont Ry. Co.*, 81 Vt. 141, 69 Atl. 732, 16 L. R. A. (N. S.) 928, 130 Am. St. Rep. 1031.    But if the damages were not due exclusively to such natural causes, in other words, if the negligence of the carrier, as an active and cooperative cause, mingled with the operation of the natural causes, the injury was not, in a legal sense, the act of God.    So if the injury which the flood occasioned might have been avoided or prevented by human prudence, foresight, pains, and care, reasonably to be expected from the carrier, but not exercised by it, the defendant is responsible.    *Nugent* v. *Smith,* 1 C. P. D. 423, 1 Eng. Rul. Cas. 218; *Smith* v. *Western Railway*, 91 Ala. 455, 8 South. 754, 11 L. R. A. 619, 24 Am. St. Rep. 929; *Williams* v. *Grant,* 1 Conn. 487, 7 Am. Dec. 235; *Michaels* v. *New York Cent. R. R. Co.,* 30 N. Y. 564, 86 Am. Dec. 415; *Wolf* v. *American Express Co.,* 43 Mo. 421, 97 Am. Dec. 406; *Baltimore & O. R. Co.* v. *Keedy,* 75 Md. 320, 23 Atl. 643; *Memphis & C. R. Co.* v. *Reeves,* 10 Wall. 176, 10 L. ed. 909; *Hecht* v. *Boston Wharf Co.,* 220 Mass. 397, 107 N. E. 990, L. R. A. 1915 D, 725, Ann. Cas. 1917 A, 445; 4 R. C. L. 719.    In *Davis* v. *Central Vermont R. R. Co.,* 66 Vt. 290, 29 Atl. 313, 44 Am. St. Rep. 852, it was found that the loss by fire of the grain while in the elevator of the defendant, occurred without its negligence; but that, if the defendant had acted upon the orders of the plaintiff and removed the grain from the elevator as soon as the trial court found it should have done, the grain would have been removed before the fire.    This Court said the proximate cause of the loss was the fire, and the delay in moving the grain the remote cause, and consequently the defendant was not responsible.    In discussing the question, however, the Court stated that if the defendant could have protected the property from fire, after it knew the fire existed, by the exercise of reasonable prudence and diligence, and did not, it

would have been liable for its failure to use this measure of prudence and diligence to protect the property,—thus recognizing the rule laid down above.

Freight agent Wadsworth was a subscriber for the *Troy Times* and read it regularly about 7.00 p. m. each day. This paper is issued about 4.00 p. m. He saw and read what the issue of March 26th gave as the forecasts concerning the high water, made at the Weather Bureau; but he did not read the issue of the 27th, he being called from home in the evening. It is said that the issue of the 26th, which he read, gave, as coming from Forecaster Todd, the following:

"The river is beyond its banks along the lowlands, but no great danger is anticipated, because there is no ice to hamper the flow."

In argument, after making reference to this prediction, and to observations made by Wadsworth and Lloyd about 4.30 p. m., on the 27th, as to the height and condition (stationary or otherwise) of the water, it is asked whether Wadsworth did not have a right to rely on the foregoing prediction of Todd. But it cannot be said, as a matter of law, that he did. In the first place, the observations made by him and Lloyd about 4.30 p. m. of the 27th, were in point of time some two hours after the water became so high that, according to the evidence, the car containing the plaintiff's goods could not be removed from track No. 2; hence these observations afford no basis for the argument. As to the prediction, the rain was continuing in the forenoon of the 27th, and the water was still rising. Both of these facts were known to the freight agent and the yard-master. The conditions were such that a new forecast was sent out from the Weather Bureau at 10.00 in the forenoon, and the forecaster remained at the telephone all day, answering inquiries respecting the flood. The predictions, as sent out at the hour last named, were of a severe flood in which the water would probably rise at Troy to a height of 25 to 26 feet. At the latter height, the water would be some inches above the floor of a freight car standing where the car of lime stood, and therefore high enough to enter the car to some extent, the floor of a freight car, as before seen, being substantially four feet above the top of the rails which are five inches high. The predictions made by Todd on the 26th; the knowledge of the freight agent and the yard-master concerning previous high waters with reference to coming into that yard;

the conditions as they saw them throughout the forenoon and until 2.00 p. m. of the 27th; the known public means provided by law for ascertaining and recording probabilities as to flood conditions in that vicinity, and giving information relative thereto; the availability of such information, and whether resort thereto would reasonably be expected from a careful and prudent man;—these were all matters to be considered with the other evidence in the case in determining the question of proximate negligence on the part of the carrier.

We think the evidence tended to show such negligence in failing to protect the plaintiff's property after the officers, agents, and servants, of the carrier knew, or, in the exercise of the care and diligence of a careful and prudent man, ought to have known, of the dangers threatening from the impending flood. And it was for the jury to say on all the evidence whether the prudence, foresight, care, and skill, reasonably to be expected from the carrier for the preservation of this property, did not require that the car containing it be not placed where it was on track No. 2, in such close proximity to the car loaded with lime, at the time it was placed there, or if put there in the first instance, that it be removed to some safer place in the yard while the condition of the water was such that it could yet be done. The motion for a directed verdict was properly overruled.

Many exceptions were taken to the admission of evidence, which might better have been presented for review, in groups, resting upon the assumption that the ruling as to one would be the ruling as to all involving only the same legal question. Exceptions of the first group are to the reception in evidence of parts of certain articles printed in newspapers published in Albany and in Troy. In connection with the testimony of deponent Todd, the plaintiff offered in evidence certain parts of a news-article in the *Albany Evening Journal,* a daily newspaper published at Albany, for March 26, 1913, reading as follows:

"March 26, 1913. River will rise to nearly sixteen feet. At noon it was twelve and one-tenth feet above sea level and will continue to rise during the day * * *. At 8 a. m. yesterday the stream was 7.9 feet above the sea level. At 8 a. m. today it was 10.8 feet; at 10.30 a. m. it had risen to 11.7 feet and at noon to 12.1 feet. Forecaster George T. Todd said that he believed the river will rise to 15 or 16 feet by tomorrow morning. He bases his statement on the heavy rainfall last night throughout the

Mohawk Valley and on the Hudson watershed. Tribes Hill during the 24 hours ending at 8 a. m. had 1.10 inches of rain and the average through the Mohawk Valley was about that amount.''

This evidence was offered ''solely as showing the availability of information and the publicity given to these forecasts as to the probable rise in the river.'' Objection thereto was made on several grounds, one of which was, that there was no evidence in the case tending to show that the defendant or any of its connecting carriers in question had any knowledge of the contents of that paper. In admitting the evidence, the court told the jury that it was not proof of the facts stated in the paper, but was introduced to show what information was available to the defendant if it had sought for it, as bearing on the question of whether the defendant, if it did not, ought to have known it, or ought to have made inquiry for itself and for the protection of the property it had in charge. Exception was saved. The deponent testified to giving to that newspaper the forecasts and information, the substance of which was used as the basis of the portion of the paper received in evidence. This, however, was not enough to render that part of the printed article legitimate evidence, even for the limited purpose specified. It had already been shown beyond question that the N. Y. C., and its agents and servants having supervision or charge of the matter of freight traffic at Troy, knew of the existence of the United States Weather Bureau at Albany, and of the maintenance there of a weather forecaster. The company and its said agents and servants had knowledge of the rise of water at Troy from day to day until it reached the proportions of an unprecedented water freshet, and during all that time had knowledge that forecasts as to probabilities could be had by application at the Weather Bureau by telephone or otherwise. This being so, on what principle was the article printed in the newspaper named admissible without evidence that it had been seen and read by some one or more of the aforementioned agents or servants of the railroad company? How did the evidence show that company, or its agents and servants, the availability of the information regarding the probable rise of the water, unless such article was notice to them of what was contained in it? The law does not give such printed articles in a public paper the effect of constructive notice. At most they can be only actual notice, and not that unless they are read. Without being read, they have no more

force as notice than any fact orally and publicly spoken at a place where the person claimed to be affected was not present. The reception of the part of the paper was therefore error. *State* v. *Alpert,* 88 Vt. 191, 92 Atl. 32; *Beltzhoover* v. *Blackstock,* 3 Watts. (Pa.) 20, 27 Am. Dec. 330; *Lincoln* v. *Wright,* 23 Pa. St. 76, 62 Am. Dec. 316; *Watkins* v. *Peck,* 13 N. H. 360, 40 Am. Dec. 156; *Hartford Trust Co.* v. *West Hartford,* 84 Conn. 646, 81 Atl. 244, Ann. Cas. 1912 D, 997.

Exceptions of the second group were taken on the ground of immateriality, to testimony given by the same deponent as to the custom at the office of the Weather Bureau, with respect to giving publicity to the forecasts there made, the testimony being that flood predictions are usually printed on daily weather maps which were mailed to about forty business houses and public places in Troy at the time of the flood in question; that flood predictions were given by telephone to a list of merchants who are in the flood district in Albany; and by warning and telephoning to the *Troy Times;* that the Chamber of Commerce at Albany had received forecasts since 1905, and probably prior thereto; that Bradstreet Company received them at Troy,—these are some of the instances where the same question was raised. We need not consider when, if ever, evidence of such service to, or relations with, third persons may properly be received. In the undisputed circumstances shown by the plaintiff that during periods of high water the N. Y. C. usually called the forecaster by telephone numerous times a day, and at the time in question generally called him up by telephone or sent some man to the office of the Weather Bureau, with respect to obtaining information regarding probabilities, what force could the collateral facts shown have in the case other than to excite prejudice in the minds of the jurors against that railroad company because it did not take steps to procure such information on March 27th, before the water had risen so high that effective measures for the protection of the plaintiff's property were no longer possible? Such facts afford no reasonable presumption or inference as to the fact of negligence in failing seasonably to take such measures, and the reception thereof in evidence was harmful error. 1 Greenl. Ev. § 52; *Lucia* v. *Meech,* 68 Vt. 175, 34 Atl. 695. Since a reversal must be had because of errors in rulings relating to the admission of evidence, the exceptions to argument of counsel are passed without further notice.

Many exceptions were taken to the charge, errors therein being asserted, both of omission and of commission. But the questions thus raised are in effect covered by what we have said upon the motion for a directed verdict, except two: Nos. 3 and 12. As to the former, defendant excepted to the court's failure to charge specifically that the burden was on the plaintiff to show that the negligence of the N. Y. C. mingled with the act of God as an operative and proximate cause. But the court charged fully and carefully in this respect as requested. The jury were instructed that it had been argued by counsel for plaintiff and conceded by counsel for defendant that on all the elements necessary for the plaintiff's recovery, the burden was on the plaintiff, explaining the meaning thereof—following this by calling attention to the fact that the court had already said that in order for the plaintiff to recover it must establish the fact that the proximate cause, or contributing cause, of the injury was the negligence of the defendant. This exception is without force.

The latter of these two exceptions was to the failure of the court to charge that, in determining whether the N. Y. C. acted as a prudent man in respect to the safety of plaintiff's property, they should take into consideration the duties and responsibilities of that carrier to its other patrons who had property in its yard and custody. Thereon it is said that the evidence shows that every month that railroad company handles 15,000 freight cars coming in and going out of the Adams Street yard; and it is argued that, as a prudent man, the company had other things to attend to besides plaintiff's car of screens. Yet it appeared further that on March 27, 1913, only about 200 such cars were handled there. It is enough to say of this exception, that there was no evidence tending to show any act done, or omitted to be done, relative to the preservation of the plaintiff's goods, because of any duties or responsibilities of the carrier to other patrons of the class mentioned in the exception. There can be no error in failing to charge in a manner not applicable to the evidence. *Hyde* v. *Swanton*, 72 Vt. 242, 47 Atl. 790; *Sherwin* v. *Rutland R. R. Co.*, 74 Vt. 1, 51 Atl. 1089; *Smith* v. *Central Vermont Ry. Co.*, 80 Vt. 208, 67 Atl. 535.

*Judgment reversed and cause remanded.*