TOWN OF BENNINGTON *v.* FILLMORE & SLADE ET AL.

January Term, 1925.

Present:  WATSON, C. J., POWERS, TAYLOR, SLACK, JJ., and MOULTON, Superior, J.

Opinion filed May 6, 1925.

*Conclusiveness of Chancellor's Findings—Judicial Notice of Effect of High Water in Stream—Sufficiency of Evidence to Support Findings as to Cause of Overflow of Stream—Evidence Held to Justify Refusal to Find—When Right of Action Accrues for Maintenance of Dam—Replacing Old Dams by New Dams of Same Height Not Conclusive as to Nonliability—When Party Maintaining Dam Has No Right to Rely Upon Maintenance of Dike by Another Person to Prevent Flooding—When Person Maintaining Dam Liable for Damage at Times of Unforeseen and Extraordinary Freshet—Injury by "Act of God"—When Person Maintaining Dam Not Liable for Flowage Caused by Unforeseen and Extraordinary Freshets—Modification of Decree Enjoining Maintenance of Dam to Permit Parties to Exercise Legal Rights—Motion for Leave to File Supplemental Bill Covering Intervening Damages Is for Chancellor on Remand —Effect of Negligence of Party Mingling with Operation of Natural Causes in Producing Injury—Mandate Against Maintenance of Dams Not Objectionable Because Not Defining Terms Used—Mandate Prescribes Duties Under Par-*

*ticular Circumstances of Case, Not What Duty Might Be in Future Under Other Circumstances.*

1. Findings of chancellor must stand, if there is evidence fairly and reasonably tending to support them.

2. Natural and well-known tendency of brush and refuse to be carried down stream at times of high water, and to lodge against any obstruction to its flow, is a matter of such common knowledge that judicial notice may be taken of it.

3. In suit by town to enjoin maintenance of dams, causing flooding of highways, evidence *held* to sustain findings that retaining wall and fills made along certain bank of the stream prevented the escape of flood water over island, and that breakwater, and sill of derrick resting on crest of dam, constituted in part cause of overflow.

4. In such action, where it appeared that a dike prevented flooding when water was not too high, and that flood water in question came over dike, and washed it out at other points, refusal of chancellor to find, as requested, that digging and refilling, incident to installing of sewer pipe near dike, softened earth and made it more susceptible to seepage and washing by high water, was not error.

5. No right of action for flowage of water accruing until some damage is done, the maintenance of dam at determined height is no invasion of rights of another person until that dam causes water to overflow the banks and causes damage.

6. Where wooden dams previously maintained in a stream, which had become old, leaked badly, and were out of repair, were replaced by cement dams, which set the water back, several hundred feet further than the wooden dams, the fact that such cement dams were of the same height and length of spillway as old wooden dams did not absolve those responsible for their maintenance from liability for damage by flowage from the greater amount of water held back.

7. Parties maintaining dams in stream *held* to have no right to rely upon the maintenance of a dike by other parties, with whom they had no contractual relations, to prevent overflowing and flooding of highway.

8. When a structure is so built and maintained as to set back water upon the land of another during the ordinary and usual conditions of the stream, the person so maintaining it is liable

for damages caused by an unforeseen and unprecedented freshet.

9. When damages suffered are proximately due, directly and exclusively, to natural causes, without human intervention, which could not have been prevented by any amount of foresight, pains, and care reasonably to be expected, there is no liability, the damages being caused by an act of God, but if negligence of one sought to be charged mingles with operation of natural causes in causing damage the injury is not, in a legal sense, the act of God.

10. Where maintenance of obstruction in stream does not cause stream to overflow in its ordinary condition, or in times of usual high water, no liability attaches for flowage caused by unforeseen and extraordinary freshets.

11. In action by town to enjoin maintenance of dams, causing flooding of highways, *held* that decree, perpetually enjoining defendants from so maintaining or replacing its dams, retaining walls, and other obstructions, at such height as to cause or permit waters of stream to overflow upon highways, should be so modified as to permit defendants to maintain such structures at such height that water will not thereby be caused to overflow upon the highways during times of ordinary flow, or periodical or usual high water.

12. In such suit, motion by plaintiff, upon argument in Supreme Court, for leave to file supplemental bill to cover intervening damages is a matter to be passed upon by chancellor on remand.

13. Mandate of Supreme Court, enjoining defendants from maintaining or replacing dams or other obstructions in a stream so as to cause or permit waters of stream to overflow on highways during all times of ordinary flow or periodical or usual high water, *held* not to require modification to make defendants liable for damage caused by unforeseen and unprecedented freshets, if they neglected to conform to the mandate, as defendants would be liable if their negligence, as an active and cooperating cause, mingled with the operation of natural causes in producing injury.

14. Such mandate was not objectionable for failing to state what constituted "periodical or usual high water," as whether some future high water may be periodical, or unforeseen and extra-

ordinary, must be determined as matter of fact when situation is presented.

15. In suit by town to enjoin maintenance of dams, causing flooding of highways, *held* that mandate of Supreme Court could do no more than prescribe duty of defendants under particular circumstances of case, and could not properly define what might be a breach of that duty under some other circumstances which might arise in the future.

APPEAL IN CHANCERY. Heard on pleadings and findings of fact of Chancellor after the June Term, 1922. Bennington County, *Butler*, Chancellor. Decree for the plaintiff. The defendants Fillmore & Slade appealed. The opinion states the case. *Decree modified, and, as modified, affirmed, and cause remanded. Motion to modify mandate denied.*

*Henry Chase* and *M. P. Maurice* for defendants Fillmore & Slade.

Findings of fact by chancellor must be sustained if there is evidence to support them, but questions of law presented by such facts, and chancellor's conclusions of law stated in the "facts" are available on appeal. *Morgan* v. *Morgan*, 82 Vt. 43, 73 Atl. 24; *Sparrow, Admr. et al.* v. *Vermont Savings Bank*, 96 Vt. 124, 129.

Under findings of fact made, both plaintiff and defendants Fillmore & Slade had a right to rely upon the continuance of the dike, without interference, because its construction showed its permanent character and made it a dedication for all time. *Cloyes et al.* v. *Middlebury Elec. Co. et al.*, 80 Vt. 109; *Ford* v. *Whitlock*, 27 Vt. 265; *Woodbury* v. *Short*, 17 Vt. 387; *Hartford Sorghum Mfg. Co.* v. *John Brush, Jr.*, 43 Vt. 528; *Stimson* v. *Brookline*, 197 Mass. 568, 16 L. R. A. (N. S.) 280; *Mathewson* v. *Hoffman*, 77 Mich. 420, 6 L. R. A. 349; *Mathewson* v. *Ward et al.*, 24 Wash. 407, 85 A. S. R. 955; *Kray* v. *Muggli et al.*, 84 Minn. 90, 54 L. R. A. 473; *Shepardson* v. *Perkins*, 58 N. H. 354; *Lake Drummond Canal & Water Co.* v. *Burnham*, 147 N. C. 41, 17 L. R. A. (N. S.) 945; *Smith* v. *Youmans*, 96 Wis. 103, 37 L. R. A. 285.

Defendants Fillmore & Slade had a right to maintain their dams at the height at which they found them. *Doty* v. *Village*

*of Johnson,* 84 Vt. 15; *Cowell* v. *Thayer,* 5 Metc. (Mass.) 253, 38 A. D. 400; 40 Cyc. 670, and cases cited.

*Fenton, Wing & Morse for defendants Walbridge and Stewarts.*

Burden of establishing claim that dike and right to flow land of Walbridge was a part of the water privilege by prescription was on defendants Fillmore & Slade, and it was incumbent upon them to procure findings essential to make out prescription. *Vermont Marble Co.* v. *Eastman,* 91 Vt. 425; *Barber* v. *Bailey,* 86 Vt. 219; *Dutton* v. *Stoughton,* 79 Vt. 361; *Wells* v. *Austin,* 59 Vt. 151; *Plimpton* v. *Converse,* 42 Vt. 712; *Tracy* v. *Atherton.* 36 Vt. 503; 19 C. J. 878.

The occasional overflow did not in any way affect rights of parties, for occasional trespasses are not sufficient to furnish any foundation for a prescriptive right. *Wells* v. *Austin,* 59 Vt. 157; *Wilson* v. *Blake,* 53 Vt. 305; *Swift* v. *Gage,* 26 Vt. 234.

The facts fail to show a dedication of the dike, dedication being a setting apart of land for public use. *Gore* v. *Blanchard,* 96 Vt. 234.

Defendants Fillmore & Slade had no right to replace old, worn-out, leaky wooden dam with a solid concrete dam, even if latter was of same height as wooden dam, as height of dam is not measure of right to flow. *Griffin* v. *Bartlett,* 55 N. H. 118; *Shumway* v. *Simons,* 1 Vt. 53; *Shrewsbury* v. *Brown,* 25 Vt. 197; *Dutton* v. *Stoughton,* 79 Vt. 361; *Dernier* v. *Rutland Ry. Lt. & Power Co.,* 94 Vt. 187; *Horner* v. *Stillwell,* 35 N. J. Law, 307; *McGeorge* v. *Hoffman,* 133 Pa. 381, 19 Atl. 413; Note, 59 L. R. A. 817.

*Robert E. Healy for plaintiff.*

Persons obstructing the natural flow of a stream are bound to provide against all natural results of ordinary freshets. Gould on Waters, 3rd ed. § 211C, p. 413; *State of Connecticut* v. *Housatonic Water Co.,* 51 Conn. 137; *Commonwealth* v. *Stevens,* 10 Pickering, 247; *Andover* v. *Sulton,* 12 Metcalf, 182; *Cheshire* v. *Reservoir Co.,* 119 Mass. 356; *Inhabitants of New Salem* v. *Eagle Mills Co.,* 138 Mass. 8; *Shrewsbury* v. *Brown,* 25 Vt. 197; *State* v. *Smith,* 54 Vt. 403; *Aiken* v. *Wells River,* 70 Vt. 308;

*Town of Bristol* v. *Palmer,* 83 Vt. 54; *Town of Sharon* v. *Anahama Realty Corp.,* 97 Vt. 336, 123 Atl. 192.

The presumption is that a structure wholly on one's land belongs to the owner of the land. *Tracy* v. *Atherton,* 36 Vt. 503, 514; *Vermont Marble Co.* v. *Eastman,* 91 Vt. 425, 463; *Plimpton* v. *Converse,* 42 Vt. 712; *Perrin* v. *Canfield,* 37 Vt. 304; *Shumway* v. *Simons,* 1 Vt. 53.

MOULTON, Superior Judge. This is a suit in chancery originally brought by the town of Bennington against the defendants Fillmore & Slade, praying for a perpetual injunction against the maintenance of certain dams owned and maintained by them across the Walloomsac River, and the maintenance of certain other obstructions in that river at a height sufficient to obstruct the water so as to cause it to overflow the banks of the river and flood a certain highway. An assessment of damages was also sought, and there was a prayer for general relief.

The defendants Fillmore & Slade filed an answer in which they alleged that they acquired title to their mill and water privilege in the year 1900; that at that time a wooden dam existed which had been there for a time to which the memory of living man ran not to the contrary; that in or about June, 1916, the defendants discovered that the wooden dam had become worn and decayed so that it was unsafe and inadequate for its purpose; that thereupon they removed the wooden dam and replaced the same by a new dam of cement concrete at the same place, and of the same height, equipped with the necessary gates and hoisting apparatus to operate the gates. The defendants denied that the erection of this new dam, gates, and hoisting apparatus caused or resulted in raising the flood water so as to cause any injury or damage to the highway mentioned in the plaintiff's bill of complaint.

The defendants further averred that at the time they took possession of the dam and water privilege and for many years, and more than fifteen years next prior to that time, there existed and was maintained on the adjoining lands of J. Ed. Walbridge, as a part of the channel and banks of the Walloomsac River, a certain dike or embankment constructed of earth, gravel, and stone, extending from near the Walbridge dwelling house to and connected with the older natural banks of the river on the Walbridge land, and that this dike or embankment served to

keep and confine the waters of the river at all periods of regular flood, freshets, or high water from overflowing the banks; and kept and confined the same and protected the highway from damage or injury by flood; that in or about September, 1919, Walbridge dug up and removed the dike or embankment and levelled the earth, and thereby diverted and continued to divert a large part of the waters of the river from flowing through its former regular and accustomed channel; and has thrown and diffused the same at all times of flood water and the regularly recurring freshets over and upon the highway.

The defendants further averred that by reason of Walbridge's conduct the damage caused by the flooding of the highway has been occasioned, and that they, the defendants, were not in any wise the cause of the injury.

After the filing of this answer the defendants J. Ed. Walbridge and Fred and Mabel Stewart were cited in as parties defendant. They filed separate answers, denying the acts attributed to them by the defendants Fillmore & Slade.

The defendants Stewart are grantees of the defendant Walbridge, the premises herein mentioned having been conveyed to them by Walbridge on April 1, 1921.

A hearing was had before the chancellor and testimony taken. The case comes to this Court on appeal by the defendants Fillmore & Slade.

The situation of the premises and the material facts found by the chancellor are as follows: The highway in question is the main highway between the villages of Bennington and North Bennington. It runs approximately east and west and is a highway which the town is bound to maintain and keep in repair. The surface of the traveled portion is of cement concrete, which was laid in 1921. This construction replaced a construction of water bound macadam, laid in 1919, which in turn replaced a highway constructed of ordinary gravel. The highway passes through Paper Mill Village, so-called, and is, for a distance, approximately parallel with the main branch of the Walloomsac River and northerly from it. The paper mills of Fillmore & Slade are situated between the main branch of the river and the highway. The highway has been in use since some date prior to the year 1835. A few rods easterly of the mill is another highway leading southerly from the main highway, crossing the main branch of the Walloomsac River by a covered bridge, ex-

tending diagonally across an island, and then crossing the south branch of the river by means of an iron bridge. This highway is referred to as the bridge road and has been in existence and use since before the year 1837. It is also a road which the town is bound to maintain and keep in repair.

About two hundred feet southeasterly of the bridge road the river divides. The larger portion or main branch flows northerly and westerly under the covered bridge, and passes south of the mill, proceeding in a westerly direction. The other portion, or south branch, flows westerly and then northerly, passing under the iron bridge and returning to the main stream some distance west of the mill. These two branches surround the island across which the bridge road extends. About three hundred and fifty feet up the river from the point where the stream divides another small branch formerly left the main stream, passing to the south, west, and north and flowing into the south branch something over one hundred feet above the iron bridge. This small branch with the main stream and the south branch surrounded an island which was known as Corcoran's Island. The small branch, however, no longer contains any water, although its bed is plainly visible. At some time during the period when the now dry small branch ran around Corcoran's Island, the defendants Fillmore & Slade constructed across it a ford or farm crossing by means of large flat stones deposited in it; which had the effect of impeding the flow of water.

The mill property acquired in 1900 by Fillmore & Slade was used more or less for mill purposes by their predecessors in title for a period of more than forty years before that date. During all this time both the main stream and the south branch were obstructed by dams, situated near their present locations, which ponded the water to a considerable distance above the premises which will hereafter be described as the Walbridge property, and the power to operate the mill was taken from those two dams. Many years ago some kind of a mill or factory was situated on the south branch but this has entirely disappeared. The old wooden dam connected with it was replaced by a stone dam which afterwards became out of repair and leaked badly.

About 1916, Fillmore & Slade commenced the construction of a riprap wall on the northerly bank of the south branch, which extended east from the old wooden dam, and from time

to time thereafter added to its height and length, until at the time of the hearing in places it was three or four feet higher than the low places in the bank, and higher than the spillway of the dam. This wall served to force the surplus water back into the main branch.

In 1916, Fillmore & Slade built a new cement dam across the main stream westerly of the covered bridge and about four feet down the stream from the site of the wooden dam which was previously there. The elevation of this dam was no higher than that of the wooden dam which it replaced. The old dam on the main stream was provided with a service gate, and the new concrete dam with a waste gate and bulkhead six by six feet, which permits the discharge of large quantities of water when left open. The stone dam across the south branch was replaced by Fillmore & Slade, in 1918, with a cement dam of practically the same height.

After the cement dam over the main branch was completed, a derrick was erected for the purpose of raising and lowering the service gates. One sill of the derrick is laid along the spillway of the dam for the distance of thirty-eight and seven-tenths feet and rests on blocks supported by the dam. The other sill extends easterly up the stream forty and seven-tenths feet and is supported by cribwork built in the pond above the dam. Other cribwork at the angle of the sills serves to support a hoisting engine and apparatus. The derrick sill is ten and a quarter inches square, and the blocks supporting it along the crest of the dam are five and three-quarters inches high, and thus the top of the derrick sill is sixteen inches higher than the crest of the spillway. The total length of the spillway is eighty-four feet, and water at times of freshets flows over the spillway to a depth of three or four feet. At the time of the hearing, dirt, silt, and débris had filled in the space between the top of the spillway and the derrick sill to some extent. This condition was calculated to interrupt to a considerable extent the flow of water over the dam so that in case of high water, unless the gates were adequate and open sufficiently to take the surplus water, the derrick sill served as a flash board to hold it back to that extent.

While installing the cement dam over the main stream, an attempt was made to install a cofferdam a short way up stream under or near the covered bridge, and a considerable amount of

timber was placed in the bottom of the stream. The cofferdam was never completed, but the timber and other material have been permitted to remain in the bottom of the stream. This obstruction is much lower than the top of the spillway, and the chancellor states that he is unable to find that in high water it would operate to raise the height of the stream perceptibly; but he does find that this obstruction has a tendency to crowd the thread of the stream in an easterly direction against the bank and tends slightly to decrease the velocity of the water.

At the point of the island where the stream divides and forms the two parts known as the main branch and south branch, Fillmore & Slade at one time caused a breakwater of stone to be constructed into the stream, extending several rods from the point of the island. This breakwater still remains, and although it is entirely covered with water when the pond is full, it serves to crowd the thread of the stream east toward the Walbridge land. The easterly bank of the main stream, which is the boundary of the Walbridge land, has been eroded and washed away to a considerable extent. The Walbridge land lies northerly of the main stream of the river and easterly of the main branch. The dwelling house is situated beside the main concrete highway close to the point where the bridge road turns southerly from its junction with the main road. The dike or embankment heretofore mentioned extends from a point near the northeast abutment of the covered bridge easterly toward the northerly end of the main part of the Walbridge dwelling house, where it joins with higher ground. This dike is an artificial structure, and no witness was able to remember a time when it was not there, but when or by whom or for what purpose it was originally built did not appear. The dike has been maintained by Walbridge and the former owners of the Walbridge property. No acts of ownership or occupancy or claim of right was ever exercised by Fillmore & Slade or their grantors, unless such may be implied from periodical overflow of the river hereafter to be mentioned.

The chancellor states that he is unable to find whether the river was accustomed to overflow its bank at that place before the original dams were built, but that without a dam or obstruction there would appear to be no reason why it should not keep within its natural banks at this place even in times of freshets.

The Walloomsac River is at flood height usually in the spring and fall of each year, and at such times it has been accus-

tomed to overflow its natural banks into the lower ground southerly of the dike, and has been with one exception, up to the year 1918, prevented from flowing beyond the dike by that construction. In 1898, however, there was a period of extraordinary freshet and the water overflowed and tore a large hole in the dike and spread over the highway, causing considerable damage. The top of the dike at this time was to some extent washed away. The dike was repaired by J. Ed. Walbridge, who then owned the Walbridge property, at his own expense.

In May or June, 1917, Walbridge installed a new sewer system and a portion of the old pipe which had been laid in 1904 along the dike was removed and the ditch was filled in with earth and stone. The chancellor states that he is unable to say whether the work on the dike at this time had the effect to raise it, and that he does not find that the dike was lowered as a whole, or in places, by Walbridge or any of the owners of the Walbridge property. At no time did the water from the river run over the top of the dike after the flood of 1898, until April, 1918, which is one of the instances of flooding of which complaint is made.

During the times of freshets on April 1 to 4, 1918; April 5, 1919; March 16 to 18, 1920; November 20, 1920; December 5, 1920; March 9 to 11, 1921; November 20, 1921; March 7, 1922; and April 10 to 12, 1922, the waters of the Walloomsac River overflowed upon the Walbridge land, ran over the dike into the main highway and across it, washing away portions of the roadway and on each of these occasions undermining the surface, causing deep gulleys and requiring extensive repairs. At one time it washed out under the rails of the street railroad, which at that point parallels and crosses the highway. During the high water of March 16 to 18, 1920, the water ran over the top of the dike for a space of about seventy-five feet, and in places the dike was washed out, the water coming over the bank of the stream in several places, one of which was near the covered bridge. The damage to the dike on this occasion was repaired by Walbridge.

The chancellor, however, finds that the flood waters that formerly escaped over and around Corcoran's Island and over the banks of the south branch have almost wholly ceased to take that course and now seek to escape over the east and north bank of the north branch. Before the cement dam was built, the high water had been accustomed to back up on the Walbridge

land and fill the basin nearly to the top of the dike and, before the construction of the retaining wall on the south branch, the flood water was accustomed to overflow the north bank of the south branch upon the island, and upon the bridge road, escaping into the main stream west of the island.

The Walloomsac River above the dams drains an area of more than ninety square miles, with abrupt mountain sides and quick run-off so that at times this stream becomes a torrent and fills and often overflows its natural banks. The chancellor finds that unless the north and east banks of the north branch are protected by a dike or some other means, or the height of the dams are lowered and other obstructions removed, or the waste gates enlarged, serious further damage may be expected; and that this situation was well known to the defendants Fillmore & Slade. He further finds that in view of the known conditions, and what might reasonably be expected, insufficient provision has been made by Fillmore & Slade to take care of the surplus waters in times of ordinary freshets; that the washout and damage to the highway was due in a measure to the construction of the cement dam over the south branch and the want of sufficient floodgates and spillways, and in a measure to the construction of the dam over the main branch which caused artificial obstruction to the natural flow of the stream, and to the inadequate provisions for the discharge of surplus water in times of freshets, which were known to occur regularly but at irregular intervals; and in a measure to the retaining wall and fills made by Fillmore & Slade along the northerly bank of the south stream which prevented the escape of flood water over the island; and in part to the obstructions in the stream at the point where it divides into the main stream and the south branch causing the main stream to crowd its east bank; and in part to the construction of the derrick resting on the crest of the dam over the main branch which served to hold back the flood water of the stream.

The town of Bennington has expended on the highway from a point northerly from the Walbridge dwelling house north of the Fillmore & Slade factory buildings, in repair of the damages caused by the overflow of the river, the sum of $2,194.20, upon which interest by way of damages should be allowed. No evidence was introduced by which the damage to the Walbridge or Stewart property could be approximated.

[1]    The defendants Fillmore & Slade attack the findings of the chancellor to the effect that the retaining wall and fills made by them along the northerly bank of the south branch of the stream prevented the escape of flood water over the island; that the construction in the stream at the point where it divides into the main stream and the south branch, and that the leg of the derrick resting on the crest of the dam, constituted in part the cause of the overflow of the stream and the consequent damage, as being without supporting evidence. It is, of course, admitted by these defendants in their brief that the findings must stand if there is evidence fairly and reasonably tending to support them. *Morgan* v. *Morgan,* 82 Vt. 243, 73 Atl. 24, 137 A. S. R. 1006.

Several witnesses testified that before the retaining wall was built along the northerly bank of the south branch the water in times of freshet flowed over the island lying between the two branches; that since the construction of the retaining wall the surplus water has not overflowed upon the island where it had been accustomed to go. The inference from this evidence is clear that this surplus water which is now confined within the limits of the south branch must seek another outlet, and that the low places in the bank which, according to the testimony, were protected by the construction of the retaining wall must have formed a natural outlet in times of freshet. It also appeared by the testimony of an engineer called by the defendants Fillmore & Slade that the building of the retaining wall would operate to cut down the length of the natural spillway, and the effect would be to send more water over the dam and raise the water.

The stone breakwater, built at the point of division of the stream into the main and south branches, had the effect of deflecting water from the south branch into the main stream and diverting the flow of water in the main stream to the east. The chancellor states in his findings that the course of the new and old channels were plainly discernible, and the evidence showed that since the construction of the breakwater the eastern bank of the stream had been considerably eroded and washed away to the extent of the destruction of a wire fence, which formerly extended along this bank of the stream, the posts of which were left hanging in the air supported only by the wires connecting them. Certain photographs which were received as exhibits clearly showed this situation. The chancellor states in his find-.

27

ings that certain stumps of trees were visible in the bed of the main branch and that the channel had shifted from the west to the easterly side of these stumps. There was evidence to the effect that the construction of the breakwater operated to send more water toward the dam across the main branch than toward the dam across the south branch.

As has been said, the total length of the spillway of the dam over the main branch was eighty-four feet and the derrick leg or sill extended along the crest of the dam for a distance of thirty-eight and seven-tenths feet. The testimony of Mr. J. L. Davis was that the derrick would obstruct the water; and an engineer called by the defendants testified that the structure on the dam held the water back slightly, possibly twenty per cent. He referred to this structure as a flash board of nineteen inches in height, with six inches off the bottom, and that the filling in of the space between the top of the dam and the lower part of the derrick sill, which was a space of five and three-quarters inches, ought to raise the water in the pond. There was other testimony to the same effect.

[2] A photograph taken in December, 1920, received as an exhibit showed driftwood and brush, which had been brought down by the water, resting against the dam and derrick leg and to a large extent filling in the space. It was claimed that there was no evidence that this condition existed at the time of the damages complained of, but these photographs had been taken before some of the occasions of freshet in question, and the natural and well-known tendency of brush and refuse to be carried down stream at times of high water and to lodge against any obstruction to its flow is a matter of such common knowledge that judicial notice may be taken of it. *Doty* v. *Village of Johnson,* 84 Vt. 15, 22, 77 Atl. 866.

[3] With the testimony standing thus it cannot be said that the findings of the chancellor with regard to the retaining wall, the breakwater, and the sill of the derrick are without supporting evidence.

[4] An exception was taken to the failure of the chancellor to find, as requested, that the digging and refilling done by Walbridge, incident to the installment of the sewer pipe, must of necessity have softened the earth and rendered it more susceptible to seepage and washing by the high water. It is claimed that the defendants are entitled to such finding as bearing upon

the question of the proximate cause of the damage. There was evidence that water came through the place where the sewer was installed, but it also appeared that the flood water on the occasion in question came over the dike and washed it out at other points. Error does not appear in the refusal to comply with this request.

[5]   The defendants Fillmore & Slade further insist that they had a right to maintain the dams as constructed because they were of the same height and the same length of spillway as the older wooden dams, which had been placed in approximately the same situation for many years previous to their occupancy of the premises, but the height of the dam is not the controlling feature. No right of action for the flowage of water accrues until some damage has been done, and the maintenance of a dam at a determined height is no invasion of the rights of another person until that dam causes water to overflow the banks and causes damage. *Dutton* v. *Stoughton,* 79 Vt. 361, 364, 65 Atl. 91; *Dernier* v. *Rutland Light & Power Co.,* 94 Vt. 187, 193, 110 Atl. 4.

[6]   The chancellor has found that the old wooden dams leaked badly and were out of repair, and that the cement dam over the main branch set the water back several hundred feet further than did the old wooden dam. It is evident that the old wooden dams in their leaky condition had no more effect upon the height of the water than lower dams of tight construction would have had, and it is also evident that with the cement dams in place more efficient means of getting rid of waste water should have been installed, if the flow of the stream was to be kept at a height approximating that existing when the old dams were in use. It does not follow that because the new cement dams are of the same height and length of spillway with the old wooden dams, the defendants Fillmore & Slade are absolved from liability for damage by flowage resulting from the greater amount of water held back.

In addition to the foregoing consideration, it may be noted that the cofferdam and other structures placed in the pond behind the dam over the main branch, while not operating to raise the water, had the effect of decreasing the velocity.

It is further claimed that defendants Fillmore & Slade had a right to rely upon the protection afforded by the dike; and the case of *Cloyes* v. *Middlebury Electric Co. et al.,* 80 Vt. 109, 66

Atl. 1039, 11 L. R. A. (N. S.) 693, is cited in support of this contention. In that case the bill of complaint set up an old contract executed in 1806 between the riparian owner on Otter Creek and the proprietors of the water power at Middlebury Falls which provided that for a valuable consideration the latter should lower the falls and remove certain obstructions from the stream. It was further alleged that the contract was fulfilled by the proprietors whereby the low lands, above the falls, were drained and made tillable; that this situation continued for more than eighty years, until the Middlebury Electric Company, having purchased an interest in the water power, erected a dam at the head of the falls and thereby raised the water on the falls about two feet higher than it had been accustomed to flow since the removal of the obstructions, and the low lands were overflowed in consequence. The case came up on demurrer to the bill, and it was held that the artificial condition created in the creek had become the natural conditions, not by prescription, or by lapse of time, or by the force of the contract, but by the force of the circumstances under which they were erected—by dedication and substitution. The contract afforded evidence of the intention to make the changes permanent—a change for all time. The riparian owners had the right to have the new conditions continue, and this right attached to all riparian lands as riparian owners—as an incident of such ownership. Whether termed a dedication or an estoppel, the principle was the same— the injustice of allowing one to deny the existence of conditions, which by his conduct, he had induced another to believe to exist, in reliance upon which that other has changed his position.

[7] It is quite impossible to apply this reasoning to the case in hand. No contractual relations existed between Walbridge and Fillmore & Slade as to the maintenance of the dike. Certainly the town of Bennington, the injured party, had nothing to do with it. Nothing which the town had done had induced the defendants Fillmore & Slade to alter their position so far as it is shown. The dike was sufficient to hold back the water (the extraordinary freshet of 1898 excepted) until the construction of the cement dams and other obstructions complained of; since that time the water has overflowed it during the periodical seasons of high water. And before that time the water overflowed during the periodical freshets, upon the bridge road. Indeed the result of the new structures appears to be that

the water which formerly flowed over the bridge road is now discharged upon the main highway. Even before the new construction, the dams were illegal obstructions of the stream.

The decretal order filed by the chancellor in this case contains, among other provisions, the following: ''The said defendants Fillmore & Slade are hereby strictly and perpetually enjoined from so maintaining or replacing the said dams, retaining walls and other obstructions mentioned in said finding of facts and from permitting them to remain and continue in such condition or at such height as to cause or permit the waters of said river to overflow upon the highways, being the main concrete highway from Bennington to North Bennington described in the findings and the highway between the bridges described in the findings, under ordinary conditions and also during all periods of high water.''

On argument it was requested in behalf of these defendants that in the event of an affirmance of the decree, the same should be modified because, as framed, the decree compels them to prevent the flowage of the highway in times of extraordinary freshet.

[8] It has been held that when a structure is so built and maintained as to set back water upon the land of another during the ordinary and usual conditions of the stream, the person so maintaining it is liable for damages caused by an unforeseen and unprecedented freshet. *Cowles* v. *Kidder,* 24 N. H. 365, 383-384, 57 A. D. 287; *Kenney* v. *Kansas City, etc., Co.,* 74 Mo. App. 301; *Ohio & M. R. Co.* v. *Nuetzel,* 43 Ill. App. 108; 2 Farnham on Waters (3d ed.) 184 § 577B.

[9, 10] When the damages suffered are proximately due, directly and exclusively, to natural causes, without human intervention, which could not have been prevented by any amount of foresight, pains and care reasonably to be expected, there is no liability; because it is an act of God. But if the damages were not due exclusively to such natural causes, in other words, if the negligence of the one sought to be charged mingles with the operation of the natural causes, the injury is not in a legal sense, the act of God. So if the injury which the flood occasioned might have been avoided or prevented by human prudence, foresight, pains and care reasonably to be expected from the defendants, but not exercised by them, they are liable. *Porter Screen Mfg. Co.* v. *C. V. Ry. Co.,* 92 Vt. 1, 11, 102 Atl. 44,

and cases cited.  But where the maintenance of the obstruction has not the effect of causing the stream to overflow in its ordinary condition, or in times of usual high water, no liability attaches for flowage caused by unforeseen and extraordinary freshets. *Eagan* v. *C. V. Ry. Co.*, 81 Vt. 141, 69 Atl. 732, 16 L. R. A. (N. S.) 928, 130 A. S. R. 1031; *Hammond* v. *Hammond*, 258 Pa. 51, 101 Atl. 855, L. R. A. 1918A, 590; *Inhabitants of China* v. *Southwick et al.*, 12 Me: 238.

[11]   So if the defendants in the instant case so modify the structure and appurtenances of their dams and retaining wall and breakwater that water is not caused to overflow upon the highways in question during times of ordinary flow, or periodical or usual high water, they will be maintaining a legal obstruction in the stream, so far as the town of Bennington is concerned, and they ought not to be placed in the position of insurers against extraordinary and unforeseen freshets.   To hold otherwise would make them liable for an act of God.   We think the decree, as framed, is open to such a construction and should be modified in this respect.

[12]   A motion was made by plaintiff, upon argument, for leave to file a supplemental bill to cover intervening damages. This is a matter to be passed upon by the chancellor upon remand.

*The decree is altered so that the defendants, Fillmore & Slade, are enjoined from maintaining or replacing their dams and other structures and appurtenances therein described, so as to cause or permit the waters of the river to overflow upon the highways here in question, during all times of ordinary flow, or periodical or usual high water, and being so altered, it is affirmed and the cause remanded.   Let a new time be fixed within which the necessary alterations shall be made by the said defendants.*

ON MOTION FOR MODIFICATION OF MANDATE.*

After filing the opinion and mandate in this case, the plaintiff moved for a modification of the mandate, for that the injunction against maintaining or replacing the dams and other structures and appurtenances ''so as to cause or permit the

---

*Opinion on motion for modification of mandate filed July 28, 1925.

waters of the river to overflow upon the highways here in question during all times of ordinary flow or periodical or usual high water," does not hold the defendants to their legal obligation.

[13]     It is suggested by the plaintiff that the mandate should contain something to show that if the defendants neglect to conform to the mandate they shall be liable for damage caused by unforeseen and unprecedented freshets. The defendants would be liable if their negligence, as an active and cooperative cause, mingled with the operation of natural causes in producing injury. *Porter Screen Co.* v. *C. V. Ry. Co.*, 92 Vt. 1, 11, 102 Atl. 44; *Cowles* v. *Kidder*, 24 N. H. 365, 383, 384, 57 A. D. 287. This liability is imposed not by force of the mandate, but by the law. It is unnecessary, therefore, to provide for it by the mandate.

[14, 15]     It is further claimed that the expression "during all times of ordinary flow or periodical or usual high water" is below the legal standard, which is, as stated in *Porter Screen Co.* v. *C. V. Ry. Co.*, *supra*, "if the injury which the flood occasioned might have been avoided or prevented by human prudence, foresight, pains, and care, reasonably to be expected from the defendants, but not exercised by them, they are liable." It is further objected that, as the mandate is phrased, the door is left open to perennial argument as to what is or what is not periodical or usual high water.

However, no rule can well be laid down as to what may, or may not, be a lack of reasonable prudence and foresight, in some future situation. Each case must be judged according to its own peculiar circumstances, and as it arises. Whether some future high water may be periodical or usual, or unforeseen and extraordinary, must necessarily be determined as a matter of fact when the situation is presented. The question cannot be forestalled. As has been said before, when the maintenance of an obstruction has not the effect of causing the stream to overflow in its ordinary condition, or in times of usual high water, no liability attaches for flowage caused by unforeseen and extraordinary freshets. *Eagan* v. *C. V. Ry. Co.*, 81 Vt. 141, 69 Atl. 732, 16 L. R. A. (N. S.) 928, 130 A. S. R. 1031. The mandate can do no more than prescribe the duty of the defendants, with respect to the particular circumstances of the case; and cannot

define what may be a breach of that duty under some other situation which may possibly arise hereafter.

The decree, as entered by the chancellor, was modified, only, by the mandate. Except in so far as it was changed in this regard, the decree was affirmed, and is now of full force. It follows, therefore, that the right to reapply, reserved therein to the plaintiff, is not affected by the mandate, which, consequently, does not require the amendment suggested.

*The motion for modification of the mandate is denied. Let full entry order go down at once.*